2310536 Carter versus Local 556 Transport Workers Union of America and Southwest Airlines Company. This would be Mr. Voretsky. Prepared to argue? You may begin, sir. Good afternoon. It may please the court. I'm Voretsky with Skadden Arps for Southwest. I'd like to address Title 7 and contempt while Adam Greenfield for Local 556 will discuss the ROA. The court should remand for a new trial under Diefenbaugh-Williams because the district court's jury instructions pulled the rug out from under Southwest's undue hardship defense. Southwest showed that accommodating Carter's practice of communicating graphically about abortion could harm employee morale and that's all Weber and Howard, this court's precedents, required at the time of trial. But after Southwest relied on this court's binding precedent to present its case to that standard, mindful of the time limits of the district court placed on trial, the new standard. Instead, it told the jury that Southwest had to prove undue hardship based on financial cost or disruption to the business. Although Groff now requires that test, it was error at the time of trial which occurred before the cert petition in Groff was even filed. That error undermined Southwest's reliance on this court's then controlling precedent without giving Southwest an opportunity to meet the new standard and for those Carter's belief-based claims, this is a practice case, not a belief case. Ms. Carter says and Southwest agrees that Southwest terminated her because of her practice of sending graphic videos about abortion. So the question is whether reasonably accommodating that practice would cause Southwest undue hardship. But neither that practice nor any of Carter's trial evidence supports a belief-based discrimination claim. How did her Facebook post not support her belief? Her Facebook posts are all about what she believes. They are about what she believes but she was fired not for the beliefs underlying the post but for the conduct of both publicly posting those graphic videos while associating herself as a Southwest employee and for the conduct of sending harassing graphic messages to a co-worker. Well, she argued, wasn't it, that it was her belief, her religious faith, whether that's practice or observance or belief itself, right? But I think the distinction is critical and Title VII draws this distinction on its face. It prohibits discrimination on the basis of belief, practice, or observance but it then allows an undue hardship defense for practice or observance only. That doesn't mean those are different or distinct claims, that just means that the defense of undue hardship wouldn't apply in belief because there isn't any outward conduct necessarily to apply the defense to. I think they are distinct theories of recovery. You can, discrimination on the basis of practice, which has an undue hardship defense, and discrimination on the basis of belief, which does not. If you conflate the two, if you say that any firing for a practice is necessarily a firing for belief. But what about a firing based on her religious belief, practice, or observance? Can't she just show one of the three? Well, she can, but if she has to show either a firing based on her practice, which is subject to an undue hardship defense, or a firing based on the beliefs that underlie the practice. Do we split hairs like that or do we just proceed under, was this termination based on her religion? I don't think it's splitting hairs at all and I think that... And I get that undue hardship applies under practice or conduct, but it's not going to apply with belief, correct? I think the step, correct, I think the statute on its face draws this distinction between belief and practice. And as a matter of common sense, belief is what's in your head, it's what you think. Practice is what those thoughts or feelings lead you to do, it's your conduct. If every practice-based claim could simply be reasserted as a undue hardship could never be a defense. Well, but the Supreme Court has said the term religion includes all aspects of religious observances and practice, as well as belief, unless the employer just demonstrates undue hardship with regard to the practice or etc. That's Groff. I mean, Groff appears to conflate them just like the plaintiff did here. I don't think Groff is conflating them, I think Groff is simply restating what the statute provides. Yes, you can have a discrimination claim based on belief, you can have a discrimination claim based on practice, but you have to prove different things in order to establish those things, in order to establish those claims. In order to show that she was discriminated against based on belief, she would have to show either direct evidence, somebody saying we're firing you because you're Christian. What if she posts this stuff on Facebook, Southwest goes through her personal Facebook feeds and then fire her? Isn't that direct evidence? Or is it because there's an inference it's indirect? I think at most that would be because of the conduct, not because of the belief underlying. Oh, you have other employees, you have other employees that Southwest doesn't go through their Facebook feed, they post all manner of things and nothing happened to them. How does that not distill down to what she said, her belief? Judge Wilson, if I may, let me disagree with the premise, because I think the premise of that question is that she had comparators that were treated differently. No, that's not the premise of my question. The point is Southwest went through her personal Facebook feed, found things it didn't like, and then fired her. Did it do that with other employees? It went through her, it found the Facebook post only in response to a complaint because she sent messages through Facebook directly to a flight attendant. Where other flight attendants. To the union president. I'm sorry? To the union president. To the union president who is also a flight attendant who needs to work with with Ms. Carter and with other flight attendants. The relevant comparator, if there is one, is Brian Taubert, who Ms. Carter pointed to at trial. Taubert was somebody who made threatening remarks towards another flight attendant, actually towards flight attendants who were opposing the union. He was terminated and then offered a reinstatement as part of his, part of the grievance process, just like Ms. Carter. Treated the same way without any religious component to his conduct. And so to the, Ms. Carter does not have any forward, and if you're looking for comparators, they favor Southwest, not Ms. Carter. If we're talking about a practice, how does the reasonable accommodation factor fit in with this set of facts, or was that just not an issue at trial? So it was an issue at trial. At trial we put forward evidence of harm to employee morale. Under this court's decision in Weber, the mere  undue hardship, but the district court in this case instructed the jury to a higher standard that didn't allow for consideration of that. The district court required, required us to show, after we had already put on our case under the Weber standard, required us to show financial costs or disruption to the business. And so on remand, we would have a chance to develop evidence satisfying the new Groff standard, but we had no reason to do that under the then existing law. So you had stronger evidence, but you just didn't introduce it at trial. Well, we didn't develop that evidence because we didn't need to under the standard. We're limited to a minimalist approach, I guess. Well, you have to make, we had to make choices in litigation given the constraints. Well, I totally get that, but I mean, it's just, it's a little bit odd to come in and argue, well, the law has changed. It's a much higher standard now. We couldn't meet the lower standard that was extant before, but we want a new trial. We could meet the lower standard, but the problem is that the district court didn't ask the jury whether we did meet that. What's wrong with the jury district court's instruction? And the district court said an undue hardship means more than a de minimis cost on the conduct of the employer's business, either in terms of financial cost or disruption of the business. Either in terms of financial cost or disruption of the business is too stringent under this court's case, this court's case law in Weber, which says that a mere possibility of harm to employee morale doesn't have to the rise to the level of financial cost, doesn't even have to disrupt the business. It just has to have a possibility of harm to morale. Here there was testimony in the record of actual harm to morale, and again, the district court didn't allow it. Isn't that harmlessness? I mean, you presented the evidence, and the jury didn't have just the possibility of morale. The jury had actual evidence about disruption to morale, and it said no. Disruption to morale can be something different from disruption to the business. Morale doesn't necessarily rise to the level of disruption to the business. Disruption to the business is the standard that the court articulated in Groff, and it's quite a stringent standard, more so than the standard under Weber. Thank you, counsel. You have reserved two minutes for rebuttal time. Mr. Greenfield. Thank you, Your Honor. Good afternoon, Your Honors. My name is Adam Greenfield, and I'm here on behalf of TW Local 556. I will be reserving two minutes for my rebuttal. The Southwest Airlines has thoroughly argued the matters under Title VII. I will begin by addressing the claims under the Railway Labor Act, and then resulting damage as assessed. Ms. Carter's claims under the Railway Labor Act suffer from two fatal flaws. First, that Carter did not satisfy the requirement for post-certification RLA claims to show that Southwest acted with anti-union animus. And two, the district court wrongly instructed the jury that all conduct, even abusive, obscene conduct, is protected by the RLA. Now, if we look at the general purpose of the RLA, as spelled out in Section 151A, it's designed to protect union organizing and collective bargaining, not individual employees' ability to argue within their unions. Specifically, the provisions Carter invokes, 45 U.S.C. 152 3rd and 4th, have historically been viewed by the Supreme Court as addressing primarily the pre-certification rights and freedom of unorganized employees. That is, preventing interference with employees' choice of their union representatives. However, once a union is certified, the RLA relies on mandatory arbitration set forth in collective bargaining agreements to resolve disputes between employees, represented by a union, and their employer. Indeed, T.W. . . . This is a dispute about the union's leadership, and basically there was a recall. I mean, it falls squarely right into reorganizing, right? Yes. If we look at cases under challenging union leadership, it's actually not protected under the RLA. That's an expansive right as provided by the NLRA. The RLA protects employees' choice of representatives, but the RLA does not protect campaigns to oust individual union officers. The expansion we can see in the NLRA as it was enacted in 1935 versus the RLA in 1926. The RLA does supply a cause of action after a union is certified only in extremely limited circumstances, in which the carrier acts with anti-union animus, because the animus suggests that the dispute resolution system cannot be there is no pro-union RLA claims, and the statute doesn't give employees a federal cause of action for intra-union disputes. Those are often handled internally. If there are internal disputes, for example, with T.W. . . . Local 556, we have Articles of Incorporation 19, 20, 21, in which fellow union employees or officers can be brought upon charges for violating their local constitutions. Furthermore, according to the held court in 2007, no sections 3rd and 4th after the employee is submitted to arbitration under the collective bargaining agreement. Now, if we look at the facts, it was only Ms. Carter expressing anti-union animus, as she was an agency fee objector. Ms. Carter's only argument was that Southwest terminated her for expressing opposition to Audrey Stone as an officer of Local 556. Carter testified at trial that her dispute with Local 556 related to the union's expenditures of dues on the Women's March. Ultimately, Ms. Carter's claims under Section 152, 3rd and 4th are doubly prohibited. She didn't allege anti-union animus by Southwest, and she didn't allege interference with a representative or the organization's unrepresented employees. Can animus be anti-union animus? I mean, what you've got here is messages from a non-union member objector, she's being forced to pay dues, to the union president saying, I want to replace you, I don't like what you're doing, I don't agree with where the union's going on this. That union official sends it to the employer and gets her fired. So, I mean, clearly this is union activity undertaken by Ms. Carter, correct? Yes, but the anti-union . . . But is it enough then that because it's union activity, and the union effectively is in cahoots with the employer, I'm just going with what the plaintiff has alleged, and obviously there was a trial on this, but is that enough to show anti-anti-union animus, and is that enough to be anti-union animus under the RLA? I think I understand your question, Chief. Well, good. I think I do, too. The anti-union animus needs to come from the employer itself, or the carrier, and that's because that's a safeguard within the statute . . . But it's penalizing this employee for union activity. Is that sufficient to be anti-union animus? No, not from the . . . because it's not coming from the employer, and again . . . But the employer fired her because of what she was communicating with the union president. I mean, that's clearly union activity, right? But it's not protected under the RLA. The RLA protects the pre-certification or selecting of the representatives for the bargaining agreement, not after union representatives . . . So it's okay for the union officials to effectively collaborate with the employer to get rid of these non-union member objectors? I didn't say that, Your Honor, and I don't believe that  erroneously instructing that all union oppositional and organizational activity is protected under Section 152, 3rd and 4th. Counsel, to make sure we understand, is the union appealing only the jury instructions with respect to the BDFR claim? Is that correct? The RLA claim lacks foundation under Section 3 and 4. The union also has issues with the jury instructions presented on the duty of fair representation claim, which I would like to address at this time, if I may. A proper claim . . . Yes? May I ask a procedural question? Did you file a Rule 50B motion for renewed judgment? And if you did, where is it in the record? No, we did not file a 50B. We didn't believe it was necessary. Well, we couldn't find it. Under duty of fair representation, a proper claim was indeed brought by Ms. Carter under the DFR, which is how you would deal with your internal union issues. However, the District Court improperly relied on an outdated case from 1966 in the Lynn case, instructing the jury that all conduct, even abusive, obscene conduct, without limitation, is protected by the RLA. That's wrong as a matter of doctrine and . . . Well, that's not the only thing that the Court said in its instructions, though, is it? They use other . . . The Court essentially allowed blanket-free speech in this respect, and they did that by drawing an analogy to the First Amendment, as Opposing Counsel did in their briefing. Now, that obviously applies to governmental and not union or private employers' ability to address free speech within their workplace. And if I may briefly, to highlight the prejudice that was found . . . And what the Court said is all union oppositional and unless it constitutes a threat or is a false statement made with knowledge of falsity and reckless disregard. So the sentence you go to and emphasize is that activity that is intemperate, abusive, insulting, or hyperbolic is protected activity under Section 152, 3rd and 4th. So it's a qualifying statement, but . . . So it's not the only thing that the Court charged here. The instructions provided to the jury said that that speech was acceptable. No, I just read you what the Court gave to the jury. I mean, I just read the instruction. The sentence you're focusing on as far as intemperate, abusive, insulting, or hyperbolic speech is protected is not the only thing the Court said to the jury. And so I guess what I'm getting to is how do you deal with lying elastomer? I mean, do we look at that? I know it's NLRB and NLRA, but . . . I mean, it's also dealing with union activities that also borders into the offensive and harsh language and all those kinds of things. Go ahead and answer. I don't believe the jury was actually given the opportunity to respond on whether the language was intemperate, abusive, because the instruction given to the jury provided that all speech was acceptable when you tie it to union protected activities. Okay. Thank you, Counsel. We have your argument. You've got two minutes for Mr. Gilliam. Good afternoon, and may it please the Court, Matt Gilliam on behalf of Charlene Carter, who joins us in the Court today. I'd like to start off by trying to respond to some of the questions your Honors raised to TWU and Southwest. There is direct and indirect evidence of discrimination based on religious belief, that they fired her for religious belief. And starting with that, as Judge Wilson pointed out, yes, there are her patently religious messages, videos and messages, that she posted on her account. When Southwest fired Ms. Carter, they held a fact-finding meeting, and she told them, she says, I'm a Christian, I'm a conservative, and I'm pro-life, and this happens to be a huge issue, and I get the message out wherever I can. Schneider, the termination decision-maker's testimony, was also direct evidence. He admitted that Carter told them in that fact-finding meeting, before they terminated her, that she was exercising her religious beliefs. And then, Schneider specifically admitted that he considered Carter's religious beliefs in his termination decision. And so there is direct evidence. Her religious beliefs can't be any factor. Yes, there's evidence of practices as well, but as this Court ruled in Hebrew, motive is especially easy to infer when the employer knows about the religious belief before he fires her. And Southwest admitted, just admitted to this Court, that they fired her because of conduct. Well, what was the conduct? It was religious conduct. Well, wait a minute. So where's the line, though, between offensive conduct that's cloaked in faith or religion and religious conduct? Well, that can be very case and fact and circumstance. Yes, but everything that someone posts doesn't pass muster just because they say, well, and I believe this as part of my religion. That's correct, Your Honor. But in this case, Carter's messages and her posts were not reported by anybody to Southwest. There was no impact on the workplace whatsoever. So maybe there is a case out there where- About the union leader. She did report those, but that was the only way that it got back to Southwest. She didn't report, so President Stone did not report Carter's messages, her Facebook posts on her personal Facebook page to Southwest. She only reported the private messages she received. Yeah, but some of those were largely duplicative. What's the difference? Of those posts themselves, there weren't. But I think what the difference is is that Southwest went digging on Carter's website to prosecute on her personal Facebook. But don't they have ground to do that when basically another employee is being harassed? Well, in this case, Carter was addressing her union after her union went and spent her forced dues to support abortion and Planned Parenthood at a march. Well, all well and fine, but when does the line between advocacy or opposing get crossed and you're into harassment, impermissible behavior? Well, in this case, of course, Southwest characterizes it as harassment, but the union in this case- I think the union president, the flight attendant herself characterized it as harassment, did she not? Well, which flight attendant? Ms. Stone. Ms. Stone was the union president. But she was also a flight attendant. She was also a flight attendant, but- She was a co-worker. But here the jury found that Ms. Stone was acting in her official capacity when she reported the messages, and all of Carter's messages, all of the testimony shows that everything that Carter sent was union and religious activity. Stone admitted that, Southwest admitted that. And here, the union has a duty under Title VII, under the duty of fair representation, and the RLA to protect Ms. Carter and not try to cause her termination or cause her discipline. So, the circumstances of this case are much different than maybe another case where you might have harassment of just an ordinary employee. Here, these were not messages to an ordinary co-worker. They were not about business, or they were not proselytizing in the workplace. They were about a union march that took place on Washington, DC. If your honor doesn't have any more questions on that point, I'll move to the- So, just to make sure we're clear, you mentioned you spent your time so far talking about direct evidence. Do I understand correctly that no argument was advanced under McDonnell Douglas, or any type of pretext that the plaintiff disavowed the pretext as part of the trial strategy? No, your honor, we didn't disavow it. We raised it in our motion for summary judgment, I'm sorry, our response to Southwest motion for summary judgment. But we just felt that the direct evidence was so strong in this case that we focused on that. But there was indirect evidence as well, and we filed our 28-J letter recently. And we referred to Harris v FedEx, where the court said that the jury can make the inferences it wants. It's not bound to the McDonnell Douglas framework when it's making decisions. And what the court really looks to is the jury's ultimate decision as to whether religious beliefs or practices played a factor. So- What is the religious practice at issue here? The religious practice at issue is Carter sharing the message that abortion is the taking of life contrary to God's will, and showing people. Her fact-finding notes that are in the record, and you will probably read, I'm happy to go back and revisit those. Address in great detail what her beliefs are, and how her practices are, and how she conveyed those to Southwest prior to her termination. And- So we shouldn't think of religious practice as something narrowly related to church service, or liturgy, or I mean, isn't this posting a political view that is, again, laced with religious undertones, or is that enough to be a religious practice? No, Your Honor, I think that, again, Ms. Carter made it clear that these are her beliefs. There was a lot of testimony in the record where she talks about how she formed these religious beliefs. And she talks about how she herself had an abortion, and that God forgave her. And she practices her religion by going out and spreading the word that abortion is the taking of human life. And she works with various groups to help promote that message. Can you comment briefly on counsel office, I take it you have a different view of, but I'd like to hear your thoughts on this conversation we had about belief, practice, or observance. Are there separate claims under Title VII? Are they, you just have to show one and you survive? I mean, tell me how that works in your view. I think that there could be a little bit too much hair splitting because there is a lot of interlay. I mean, in here, her religious beliefs are integral to all of her practices. And Southwest fired her for both. For instance, in its termination letter, Southwest says that the beliefs at the heart of her videos and messages were highly offensive in nature. And it fired her without any sort of inquiry into accommodation whatsoever. That in and of itself is sort of a repudiation of the beliefs. What would be the accommodation here? That was going to be my next question. That's a great question, your honor. Identify it in your briefing. So the accommodation is simply not firing her in this. So you can post whatever you want on Facebook and you can harass other employees as long as it's cloaked in religious conduct or religious practice? No, I don't think so. How are they supposed to accommodate that, I mean, I guess? Well, in this case, I think that the jury recognized that she did have sincere religious beliefs. Nobody's questioned or doubted her religious beliefs and practices. So that's not issue in this case. Now, maybe in another case, you're correct that, you know, there could be an issue of harassment that just didn't exist. But what is at issue at this case, I guess, is what the employer is supposed to do between accommodating, which effectively is green lighting, what your client here did, and also protecting other employees from hostile work environment. Title VII doesn't work that way, right? Well, what the very first step of the analysis, which Southwest and TWU both failed, the very first step of accommodation is to consider and evaluate whether an accommodation is possible. They didn't do that and that's why they get no remand whatsoever. Their Title VII appeal fails on that basis alone. Abercrombie establishes an affirmative duty on their part to undertake the accommodation process. Does the plaintiff have to request an accommodation? No. What was it here? No, they have an affirmative duty to seek an accommodation to evaluate it. Again, as in Weber more recently said that the employer, sue esponte, must engage in a thorough consideration examination of any and all alternatives. Groff reinforces that Southwest can assert undue hardship when it repudiated the very notion of accommodation. And that's what it did. It repudiated the very notion of accommodating religious practice. To quote the key trial testimony, plaintiff's counsel at trial asked Ed Schneider, the decision maker for Southwest on the termination, did you make any inquiries into whether Charlene Carter needed a religious accommodation? Answer, no. That ends the appeal right there. They had an accommodative duty, as Alito said in his currents, the prohibition of discrimination based on religious practices is meant to force the employer, to force employers to consider whether those practices can be accommodated without undue hardship. That didn't happen here. Ed Schneider also. Let me ask you before we get to the RLA, I know you've got some time remaining. My understanding is that Southwest's investigation found that the images, the abortion images did not violate Southwest's internal policies, but rather your client was terminated because the images of the women dressed in various attire at the women's march did. And that was the cause of her termination. Is that correct? That was one reason. So actually they identified several buckets that led to the termination, the videos and the messages, the religious videos and messages being part of that. The other were these pictures. Sexually explicit attire. Yeah. These were. Where were those posted? They weren't posted anywhere. They were sent only to TWU President Stone. On Facebook. They were sent to her via private message. And what that was, Ms. Carter in that message says, did you all dress up like this when you went to the women's march? And of course there were many people who were dressed up like that at the women's march. It, Ms. Carter said, well, how was this coded in our LM2? How was this coded in your LM2s, meaning the Department of Labor Financial Reports? So she was, this was more of her RLA protected speech where she was objecting to how the union spent its money in the union activities. But the photographs were not posted, I understand your point, but the photographs were not posted either on the union website or Facebook page or anything like that. Via private message only. The only thing that was public on Carter, was posted on Carter's own personal Facebook page and those were two of the videos, same two she sent to Audrey Stone. And she was indicating in her messages that these are against my religious beliefs. Well, she was complaining about the expense also, right? Yes, absolutely. She was objecting to how the union is spending her forced dues that the RLA forces her to pay. So I want to address real quickly, there is no anti-union animus requirement. Basically, Southwest and TWU have seized on this language from cases that tend to address it that way because you usually have the union and union members who are at loggerheads. If you said, if you took it to the extreme and said that for Carter's retaliation claim, she had to allege anti-union animus, she would never win. Non-member employees' rights to object and oppose their union representation would never be cognizable under the RLA. So it's a very extreme interpretation. But does that just suggest that her claim is beyond the scope of what the RLA allows? No, because it's very clear that the RLA protects union members, excuse me, union non-members' rights as much as members' rights. They're the exclusive union representation scheme that requires all employees, including non-members, to pay forced dues and be represented to a union. They give up their rights to negotiate directly with the employer. If they have to do that and then they have no rights, the whole RLA and the exclusive representation scheme would have to unravel and it would be a constitution. Well, but that's, whoa, whoa. I mean, it's not that they have no rights. We're talking about her employer and for her employer to have acted improperly, there has to have been anti-union animus, right? No, Your Honor. I think that for her employer to have acted improperly, we allege in our cross-appeal that just the violation of her statutory rights is enough. There's no heightened animus bar. But I'm talking about the retaliation claim. But the retaliation claim, she alleged animus by showing in accordance with this court's decision in Rosello that her protected activities were a substantial amount. You've got to do more than allege it. It's got to be evident. And we proved it. And the jury found for us that for Ms. What is the evidence of anti-union animus? It's all of Carter's messages to the union, to the TWU president, who that are opposing the union's activities at the Women's March. It's her objecting to how they spent her money. It's objecting to their representation of flight attendants. Remember, there's also in the background this ongoing recall campaign to change the union's representation because Ms. Carter, as a non-member, was very dissatisfied with the way the union was representing her. So your answer to the question I asked counsel opposite is, if it's union activity, I'm going to repeat the question or paraphrase it. If it's union activity and the union sends it to the employer and the employer terminates as a result, that's enough for anti-union animus. It is. And here In other words, anti-anti-union animus is enough also. I think that's right. It's animus. So where's your case that supports that or your best case? Rosello is probably the best case that's from this circuit. But also there's the Brotherhood of Locomotive and Engineers. I call it the BLET case. It's a more recent case from this court. And it shows that it talks in terms of animus. It's not specifically anti-union animus. It talks more broadly. And it says the animus exception encompasses attempts to punish employees for their union associations. But that also must mean punishing them for not associating, not supporting the union, for opposing union representation. And we also, I should also add in there the Russell case which affirms that employees have a right under the RLA to remove a union and decertify a union and oppose a union as much as it does to go out and organize a union in the first place. So I think getting into the district court's Austin instruction, that reflects the RLA's vigorous speech protections for nonmembers' pure union objection and opposition speech. And in accordance with the RLA's express statutory text, we start of course with the RLA's text. Here is some of the key text from the RLA. RLA 151A23 which is, it determines how you enforce the rest of section 152. It expressly forbids and I quote, any limitation on freedom of association among employees and provides for the complete independence of employees in the matters of self-organization. And the district court also adopted that Austin jury instruction because the Supreme Court held that when a represented employee is speaking to their exclusive union representative, the RLA imposes and I quote, constitutional limitations on the union's power to deny, restrict, destroy or discriminate against the employee's rights. Now this isn't a case where we have to talk about state action. What we're talking about here is the robustness and vigor with which the RLA protects employee statutory rights. And that's what the Supreme Court said in Steele about the strength of those rights. And here, you know, the, this was not, these were not speech and activities that affected the workplace. Let me just, let's look at some of the facts. Ed Schneider, termination decision maker said that as soon as he read Stone's complaint, he knew it involved Carter complaining to her union and engaging in union related activities. He acknowledged that every complaint Carter was making in her communications with Stone concerned TWU and the president's actions. Schneider also admitted that Stone was acting as union president and not as a flight attendant when she received Carter's messages. Schneider also testified that the investigation never revealed a single comment from Carter to Stone that was outside of Stone's job as union president. So, RLA 151A, 2 and 3 and the protections recognized in Steele for employee's rights are what guide the Austin instruction. Thank you, counsel. We have two minutes of rebuttal for Mr. Voretsky and then two minutes for Mr. Greenfield. Thank you, your honor. Let me return to the question of practice observance and belief. Because Judge Wilson, I think you asked, don't you just have to show one? I think you do just have to show one, but they require different showings. There are two different things that Title VII puts on different tracks and for good reason. There's an undue hardship defense for practice. There is no defense for belief-based discrimination. Here, Mr. Gilliam argues that there is direct evidence in the case. The only direct evidence is that she was fired based on her conduct, which is subject to the undue hardship defense. There's no evidence that she was fired for the beliefs underlying the conduct, namely because she was Christian. Certainly, there is no direct evidence of that. In fact, the decision makers who fired her were themselves pro-life Christians. With respect to the waiver point, Ms. Carter repeatedly waived any reliance on indirect evidence. Record on appeal 10354, it's also recounted in the summary- If there's direct or indirect evidence or both are presented at trial, isn't that for the jury to decide? I think the sufficiency of the evidence is for the jury to decide. But as this court reviews the jury's verdict and asks whether there is sufficient evidence, it can fall into one of those two categories, either direct evidence, she was fired because somebody said, I don't like pro-life Christians, or indirect evidence, comparators, statistical evidence, and the like. She relied exclusively on a direct evidence theory. She waived reliance on an indirect evidence theory. And she doesn't have any direct evidence. She doesn't have indirect evidence either. The only evidence that she has is that she was fired because of her conduct. That's a practice-based theory that is subject to the undue hardship defense. With respect to the accommodation, our second brief at pages 31 to 34 explains why it's legally incorrect that the employer has a burden to consider accommodations. At trial, we would simply have to show that no accommodation was possible without undue hardship. And we could do that because, as Mr. Gilliam said today, and as Ms. Carter said in her testimony, her goal was to get the word out as far as possible. So the only thing that Southwest could do, in her view, would be to let her send these kinds of harassing, threatening statements to co-workers. All right, thank you. Thank you. Mr. Greenfield. The court posed the question to opposing counsel about where is the line. The line can't be so far that a union officer subjugates their own rights to be free from harassment upon taking office with the union. Union officers are still employees of Southwest. Speech loses protection in the workplace because decorum and civility must have a place. Now, to address the cases brought forth- She was acting in her official capacity. She said that. She conceded it. Ms. Stone did. Ms. Stone still has the rights of an employee to be free from harassment. Acting in her official capacity as the union president, that sort of changes the calculus, doesn't it? Until the speech loses protection because it becomes vulgar, obscene, impertinent. And at that point, it does cross a line, even within a union context. Now, the cases cited by opposing counsel Rosello, Russell, Austin, those are all cases that are pre-certification or when selecting a bargaining unit. The pre-certification in or opposition to the bargaining unit, all covered under the RLA. Carter's case is outside of that in dealing with, again, challenging union leadership is not protected under the RLA. Now, if we look at the Austin decision, that held merely that the federal labor law sometimes preempts state libel laws, because some state libel actions might interfere with the national labor policy. Again, if there isn't a line, then employers and unions alike will have no ability to keep any sort of civility or decorum. Individuals can say whatever they like, however they like. A line must be drawn somewhere. Well, but Lionel Lastermer's lets union organizers go pretty far along that line. It does, but the Supreme Court and its progeny in Steele, and TWA have all set forth a line that if you cross into obscene, vulgar communications, that you lose your protection under the RLA. Thank you, counsel. Thank you all for the briefing in this case, as well as your remarks here today. The court will consider the matter.